NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROBERT WOODROW CARNES,**

        **Plaintiff,**

v.　　　　　　　　　　　　　　　　　　　Case No. 6:17-CV-1173-ORL-40KRS

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Robert Woodrow Carnes, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 12, 14, and the parties' Joint Memorandum, Doc. No. 18.[1]

### PROCEDURAL HISTORY.

In 2013, Carnes filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.* He alleged that he became

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 15. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order. *Id.* at 4.

NOT FOR PUBLICATION

disabled on April 26, 2013. R. 160. After his application was denied originally and on reconsideration, Carnes asked for a hearing before an Administrative Law Judge ("ALJ"). R. 97. An ALJ held a hearing on April 25, 2016. Carnes, accompanied by a lawyer, and a vocational expert ("VE") testified at the hearing. R. 28-49.

After considering the hearing testimony and the evidence in the record, the ALJ found that Carnes was insured under OASDI through June 30, 2018. The ALJ concluded that although Carnes worked after the alleged disability onset date, he had not engaged in substantial gainful activity. R. 15.

The ALJ found that Carnes had the following severe impairments: cervical and lumbar degenerative disc disease. *Id.* The ALJ concluded that Carnes' mental impairments caused no restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in concentration, persistence or pace, with no episodes of decompensation of extended duration. R. 16. The ALJ determined that Carnes did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations. R. 17.

The ALJ found that Carnes had the residual functional capacity ("RFC") to perform light work with the following limitations:

> [N]o more than occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs but never ladders, ropes, or scaffolds; frequent pushing/pulling with the upper extremities; avoid: work at heights, work with dangerous machinery, constant vibration, constant temperatures over 90°F and under 40°F, constant foot controls, and overhead reaching and overhead lifting; work tasks should be those learned in 6 months or less, requiring no more than frequent interactions with coworkers, supervisors, and general public.

R. 17.

After considering the testimony of the VE, the ALJ found that Carnes was not able to perform his past relevant work. R. 20-21. However, he could perform light, unskilled work available in the national economy. R. 21-22. Therefore, the ALJ found that Carnes was not disabled. R. 22.

Carnes requested review of the ALJ's decision by the Appeals Council. R. 158. On May 8, 2017, the Appeals Council found no reason to review the ALJ's decision. R. 1-3.

Carnes now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Carnes having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Carnes' privacy to the extent possible.

Carnes was born in 1967. He graduated from high school and attended two years of college. He previously worked doing data entry and as a claims adjuster for an insurance company.

R. 31.  He had also worked as a customer service representative.  R. 32.  He stopped working in May 2013.  R. 31.

During the ALJ's hearing, Carnes testified that he had a constant, sharp pain in his neck that radiated down his arms and that his hands were tingly and then numb.  The medication he took made him sleepy and unable to function, R. 33-36, but he also reported difficulty sleeping due to pain, R. 44.  He also had low back pain and pain in his right thigh.  R. 37.  He sometimes became very frustrated and anxious followed by depression.  R. 38.  In a full-blown anxiety attack, he would hyperventilate and not be conscious of what was going on.  R. 39.  These attacks could last up to one hour.  R. 43.  He had been taking Paxil for seven years.  He was not currently under the care of a counselor due to lack of insurance.  R. 39.  However, in a written report dated February 15, 2014, Carnes stated that he had been treated regularly by a psychiatrist.  R. 295-300.[2]

Carnes estimated that he had to sit down about every twenty minutes.  R. 40.  Problems with his hands made it difficult for him to pick up objects.  Reaching above his head with his right arm caused pain.  R. 42.

Carnes could perform some household chores with breaks.  R. 40.  He was able to attend his appointments.  R. 41.  He spoke to his sister by telephone and interacted with friends through social media.  During a typical day, he watched television and read books.  R. 41.  He cared for his personal hygiene.  He could prepare simple meals.  R. 33.

Medical records reflect that Carnes was treated by Juliet D. Burry, M.D., at Pain Management Institute of Orlando, LLC from June 2011 through February 2014.  R. 389-507.  At

---

[2] Another written report reflects that Jeffrey Krotenberg, D.O., treated Carnes for depression and anxiety.  R. 256.  It appears that the SSA requested records from Dr. Krotenberg.  R. 73.

4

his initial evaluation, Carnes complained of neck and right arm pain with paresthesia in the right hand with numbness. Sitting, walking, lying down, sneezing and kneeling made the pain worse. He previously tried a variety of treatments, including medication, and physical therapy. R. 389. Upon examination, Dr. Burry noted tenderness to palpation in the right trapezius and cervical muscle groups with decreased range of motion in the cervical spine. A Spurling's sign was positive for pain in the cervical spine. Phalen's and Tinel's signs were positive for pain in the upper extremities. He had 5/5 motor strength in all extremities except 4+/5 right hand grip strength. His affect and demeanor were appropriate. Dr. Burry's diagnoses were cervicalgia and cervical radiculopathy following an earlier fusion at C5-6. Dr. Burry prescribed medication and administered a cervical epidural injection. R. 389-90.

On July 12, 2011, Carnes continued to report a great deal of pain. Upon examination, Dr. Burry observed mildly improved range of motion in the cervical spine, tenderness to palpation in the upper back and a positive Spurling's sign. Dr. Burry prescribed a TENS unit and administered a trigger point injection. R. 393-94.

On July 26, 2011, Carnes reported that he received 40% improvement in his pain but the pain remained constant, radiating into his right arm with numbness. Dr. Burry administered a facet joint injection. R. 392.

On August 24, 2011, Dr. Burry noted that Carnes had done reasonably well and that the TENS unit helped significantly. His sharp, stabbing pain had resolved, but he continued to have numbness in his right arm. R. 395. Dr. Burry continued to treat Carnes with medication. R. 396.

On October 24, 2011, Carnes reported having the best results from injections. He was again complaining of pain on the right. Dr. Burry observed decreased range of motion in the

cervical spine with tenderness on the right. Her diagnoses were cervicalgia, cervical facet syndrome, and cervical radiculopathy. R. 399. She administered a right cervical facet joint injection. R. 400. Thereafter, Dr. Burry was not able to administer additional injections for a period of time due to Carnes' insurance problems. *See, e.g.,* R. 409, 419.

On June 26, 2012, Dr. Burry administered a cervical facet cortisone injection. R. 423. In July 2012, Dr. Burry observed on examination tenderness at C7 and pain with range of motion. Motor strength was 5/5. R. 430. In August 2012, Dr. Burry's treatment note reflects diagnoses of cervical spondylosis without myelopathy; brachial neuritis or radiculitis NOS; and cervicalgia. R. 438. She prescribed Percocet. R. 436.

A cervical MRI taken in August 2012, showed disk bulges at C3-4 and C4-5 with neuroforaminal narrowing. R. 443. There was also progression of a disk bulge at C6-7 and severe right and mild left neuroforaminal narrowing with effacement of the ventral thecal sac without significant cord impingement. Surgical changes at C5-6 were noted from an earlier cervical disk fusion. R. 444.

Dr. Burry continued to treat Carnes with medication thereafter. *See, e.g.,* R. 445, 453, 457, 464, 470, 478, 502. She also administered injections. R. 502. Her treatment notes consistently reflected that Carnes had a normal mental status. *See, e.g.,* R. 459, 464, 470, 478, 484, 496, 522, 539.

On April 9, 2013, shortly before the alleged disability onset date, Dr. Burry examined Carnes, who reported that a cervical trigger point injection improved his condition significantly yet he still had stiffness in his neck and right shoulder, as well as right arm pain with numbness in his right finger tips. R. 507. Dr. Burry noted that he had 5/5 motor strength in both arms. Sensation

in the right forearm, thumb and index finger were decreased, and a Spurling's test was positive. The diagnoses were displacement of cervical intervertebral disc without myelopathy; cervical spondylosis without myelopathy; muscle spasm; tension headache; brachial neuritis or radiculitis NOS; and cervicalgia, for which she prescribed medication. She scheduled another cervical trigger point injection. R. 508.

On May 13, 2013, Carnes returned to Dr. Burry. R. 515. He reported 50% improvement from the last trigger point injection. He still had stiffness in his neck, right arm pain and numbness in his right finger tips. R. 516. Upon examination, Dr. Burry observed tenderness in the cervical, trapezius and rhomboid muscles with exquisitely tender trigger point pain. A Spurling's test was positive for cervical pain. Dr. Burry continued to prescribe medication. R. 517.

On May 30, 2013, Dr. Burry observed sensation to fine touch within normal limits in the arms, and decreased sensation in the outer upper arm, radial forearm, thumb and index finger. Spurling's tests were positive. R. 522. On July 10, 2013, Carnes reported that Soma made him feel drunk. He asked for a note to be excused from jury duty because he could not sit for long periods of time. R. 526.

On October 30, 2013, Carnes continued to complain of neck, right shoulder, back, left arm and right hand pain. R. 543. Upon examination, Dr. Burry observed tenderness in the cervical, trapezius and rhomboid muscles and exquisitely tender trigger point pain. Carnes had increased range of motion in the spine. His motor strength was 5/5 in his upper extremities. He had decreased sensation in the right arm, thumb, and index finger. A Spurling's test was positive. R. 544.

On November 26, 2013, Carnes reported low back pain and left hand pain. He indicated that his activities of daily living ("ADLs"), sleep and overall function improved with treatment. R. 547. On December 18, 2013, Carnes complained of neck pain. Upon examination, Dr. Burry observed reduced range of motion in the neck with a positive Spurling's sign. Carnes had 5/5 motor strength in his extremities. His affect and demeanor were within normal limits. Dr. Burry wrote: "Because of the treatment, the patient is able to remain employed." She continued to treat Carnes with narcotic pain medication. R. 548.

On January 20, 2014, Dr. Burry observed that Carnes had an antalgic gait. He had decreased sensation to fine touch in both arms and a Spurling's sign was positive. His affect and demeanor were within normal limits. Treatment with medication continued. R. 550. On January 28, 2014, and February 11, 2014, Dr. Burry administered cervical epidural steroid injections. R. 552, 554.

On February 17, 2014, Carnes reported that his pain had improved significantly with treatment. He had no complaints of intolerable side effects with medication. Dr. Burry wrote: "The patient reports that between the regular injections and medication, along with the conservative therapy at home, the patient's quality of life has improved dramatically." R. 556. He complained of low back pain that had not previously been addressed due to lack of insurance. Dr. Burry observed reduced range of motion throughout the lumbar spine and a straight-leg raising test was positive for pain in the sciatic notch. Carnes' affect and demeanor remained within normal limits. R. 556.

Michael P. Bellew, M.D., a neurosurgeon, examined Carnes in May 2014 at the request of Dr. Burry. He noted that Carnes began taking Paxil in the last six months for anxiety and that he

had met with a psychologist. On examination, Dr. Bellew found full muscle strength in the upper and lower extremities. He observed mild discomfort with Tinel's sign in the ulnar nerve in the right elbow. He did not see signs of spinal cord dysfunction, and he noted that Carnes' walk was normal. Some numbness was observed on testing in digits of the right hand and minimal numbness in digits on the left. He did not believe that surgery would offer relief in the cervical spine. He found no significant degeneration or stenosis in the lumbar and thoracic spine. R. 562-63.

In August 2014, Carnes sought treatment from Dr. Burry for pain, numbness and tingling in his left arm; neck, mid-back, shoulder blade pain; and a sore right arm. He complained that Valium caused balance issues. The treatment note reflects that since his last visit, his psychiatrist increased his dosage of Paxil. His physical examination was the same as the prior exam. Dr. Burry adjusted his medication. R. 598-99. Dr. Burry administered a cervical epidural injection. R. 595.

On August 27, 2014, Carnes reported neck and right shoulder blade pain radiating into his hand and back pain starting at the left shoulder blade radiating into his hand. He indicated that medication took the edge off the pain. Dr. Burry observed that Carnes had a nonantalgic gait. He had decreased cervical range of motion and tenderness of the cervical facet joints. His motor strength was 5/5 in his upper extremities with no numbness or dysesthesias. A Spurling's sign was positive. His affect and demeanor were within normal limits. Dr. Burry scheduled a cervical facet injection. R. 592-93.

On September 25, 2014, Carnes complained of neck and sciatica pain following activities while he was moving. R. 590. On October 20, 2014, he reported that activities of daily living, sleep and overall function had improved with treatment. Upon examination, Dr. Burry noted

improvement. She wrote: "Because of the treatment, the patient is able to remain employed. P/T JOB FROM HOME." R. 588.

On November 18, 2014, Dr. Burry administered a left cervical facet injection. R. 585. On November 24, 2014, Carnes complained of pain in his hand, shoulder and cervical spine. He asked to stop Tramadol because his psychiatrist was worried about Serotonin syndrome. Upon examination, Dr. Burry noted that cervical spine range of motion has improved. R. 583.

On December 9, 2014, Dr. Burry administered a right cervical facet injection. R. 578. On December 16, 2014, Carnes reported that his condition improved after the injections, but he still had pain in his cervical spine and hands, and weakness in his arms. R. 576.

On January 19, 2015, Carnes stated that he had pain in the cervical and lumbar spine with numbness in his right hand and slight numbness in his left hand. He could not lift items with his left arm, and with range of motion his arm "locks up on him." Pain was worse with activities of daily living and he still had difficulty sleeping. Nevertheless, with treatment he reported that his quality of life had improved. R. 573.

In February 2015, Carnes complained of pain in the cervical and lumbar spine, right shoulder and right wrist. He did not complain of intolerable side effects with medication. Dr. Burry continued to treat Carnes with medication. R. 571-72.

During the hearing, the ALJ asked the VE to consider a hypothetical person with the RFC he assigned to Carnes. R. 45-46. The VE opined that this hypothetical person could not perform any of Carnes' past relevant work. The person could perform the light, unskilled jobs of small parts assembler, electronics worker and plastic hospital products assembler, all of which were available in the national economy. R. 46-47. If the ability to perform handling and fingering were

NOT FOR PUBLICATION

reduced to occasional in the dominant hand, the person could not perform those jobs. R. 47. Similarly, needing to alternate positions at will would eliminate all competitive work. R. 48. However, the person could perform the identified jobs if his contact with the general public, co-workers and supervisors was only occasional. *Id.*

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, Carnes asserts two interrelated assignments of error. He contends that the RFC assessment is not correct because the ALJ did not fully develop the record regarding his mental impairments and failed to state the weight given to the opinions of Dr. Burry, a treating physician. Due to the errors in the RFC assessment, Carnes argues that the testimony of the VE was not based on a hypothetical question that included all of his functional limitations. He asks that the Court reverse the final decision of the Commissioner and remand the case for an award of benefits. These are the only issues I will address.

*RFC Assessment.*

Psychiatric Treatment Records.

The record reflects that Carnes was treated by a psychiatrist, but there are no treatment records from this professional in the file. Counsel for Carnes argues that the ALJ erred by failing to fully develop the record. Counsel for the Commissioner responds that, even if the ALJ erred in this respect, Carnes has not shown how the omission of the mental health treatment records prejudiced him.

The record reflects that Dr. Krotenberg treated Carnes for depression and anxiety from 2012 through 2014. R. 323. Because a hearing before an ALJ is not an adversary proceeding, the ALJ

11

has a basic obligation to develop a full and fair record. This obligation exists even if the claimant is represented by counsel. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

The record reflects that the SSA requested records from Dr. Krotenberg, but it appears that none were received. Nevertheless, at the ALJ's hearing, counsel for Carnes stated in response to a question by the ALJ that there was not any evidence related to the claim which was not already in the file. R. 30-31. In light of this response from counsel, the ALJ did not err by failing to take additional steps to obtain records from Dr. Krotenberg.

Even if Dr. Krotenberg's treatment notes should have been included in the record, current counsel for Carnes has not established that this evidentiary gap resulted in unfairness or clear prejudice. *Vesy v. Astrue*, 353 F. App'x 219, 224 (11th Cir. 2009)[3] (quoting *Brown v. Shalala*, 44 F.3d 831, 935 (11th Cir. 1995)). Dr. Burry's treatment notes consistently reflect that Carnes' mental status was normal. As counsel for the Commissioner correctly observes, Carnes has not submitted any treatment notes from Dr. Krotenberg showing that he suffered from mental functional limitations not included in the RFC assessment.

## Weight Assigned to Opinions of Dr. Burry.

In *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011), the United States Court of Appeals for the Eleventh Circuit reiterated long-standing law in this circuit requiring an ALJ to "state with particularity the weight given to different medical opinions and the reasons therefor." This requirement is particularly important regarding the opinions of a treating physician, such as Dr. Burry. "[T]he testimony of a treating physician must be given substantial

---

[3] Unpublished decisions of the Eleventh Circuit are cited herein as persuasive authority.

or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

In the decision, the ALJ did not mention Dr. Burry by name or state the weight given to her medical opinions. Counsel for the Commissioner argues that this error is harmless because "the ALJ thoroughly discussed Dr. Burry's treatment notes" contained in exhibits 3F and 6F. Doc. No. 18, at 29 & n. 5.

> The ALJ's complete statement of the records in Exhibits 3F and 6F is as follows:
>
> The RFC is supported by objective findings in the medical evidence, testimony and reports of record. Findings on exam, along with claimant's reports, show pain consistent, and significantly improved with treatment causing overall improvement in ADL's and functionality. Range of motion in the cervical spine increased in all planes; Phalen's and Tinel's signs were negative; strength in the upper extremities was a full 5/5 with no numbness; diagnoses are: cervicalgia and spondylosis without myelopathy, disc displacement, muscle spasm, brachial neuritis or radiculitis NOS, lumbar spondylosis and degenerative disc disease, and pseudoarthrosis after fusion. (Exhibit 6F) Claimant underwent a cervical fusion of C5/6, with full 5/5 upper extremity strength, no spinal cord compression, and normal gait. Sensation is intact and heel and toe walking is within normal limits. Claimant reported 40% improvement in pain, and had appropriate affect and demeanor. (Exhibits 3F, 5F) . . . .
>
> Diagnoses are cervical and lumbar degenerative disc disease. (Exhibits 1F, 2F, 3F) . . . . Follow up notes show complaints of pain, but radiographic and objective findings do not support incapacitating limitations. The August 25, 2012 MRI shows surgical changes of C5-6 anterior cervical disk fusion, progression of disc bulge at C6-7, and disk bulge and uncovertebral arthropathy at C3-4. (Exhibits 3F/55-56, 4F) . . . .
>
> Pain management has consisted of narcotics and injections. (Exhibits 3F, 6F) [Carnes] continued to report chronic and debilitating pain symptoms with some positive findings of decreased sensation of the right thumb, diminished reflexes at 2/4, and positive Spurling's test, but overall exams were unremarkable. Notes show full motor strength of 5/5 in the upper and lower extremities; sensation within normal limits; and, negative Phalen's, Tinel's, and Spurling's tests. (Exhibit 3F, 6F/25) In October and December 2014, pain management notes show pain significantly improved with treatment. (Exhibit 6F/9/21)

NOT FOR PUBLICATION

R. 17-19. This is not a comprehensive statement of Dr. Burry's treatment notes. For example, examinations were not "overall unremarkable." Dr. Burry's noted tenderness in the cervical, trapezius and rhomboid muscles and exquisite tender trigger point pain. Range of motion in the cervical and lumbar spine was reduced. A straight-leg raising test was positive for lumbar pain.

Because Dr. Burry did not provide a functional capacity assessment, other than references to Carnes' ability to work part-time, it is not evident that her opinions are consistent with the ALJ's RFC assessment. Counsel for the Commissioner's attempt to provide the analysis the ALJ did not include in the decision cannot be considered because this after-the-fact justification of the ALJ's failure to state the weight given to the opinion of a treating physician is insufficient to permit meaningful review of an ALJ's decision. *See, e.g., Gatewood v. Comm'r of Soc. Sec.*, No. 6:09-cv-122-Orl-31KRS, 2010 WL 455318, at *13 (M.D. Fla. Feb. 3, 2010) (citing *Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984) (per curiam)).

Therefore, I recommend that the Court find the ALJ's decision is insufficient to determine that the failure to state the weight given to Dr. Burry's opinions is harmless. Without a proper evaluation of the opinions of this treating physician, the RFC assessment is not supported by substantial evidence.

### *Testimony of the VE*.

In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments. *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). Here, the hypothetical question to the VE was based on the RFC assessment that was determined without proper consideration of Dr. Burry's opinions. This error undermines the testimony of the VE.

Therefore, I recommend that the Court find that the ALJ erred by failing to state the weight given to the medical opinions of Dr. Burry, which error undermined both the RFC assessment and the hypothetical questions to the VE.

### *Proceedings on Remand*.

If the Court accepts the recommendation that the ALJ erred, then the final decision of the Commissioner is due to be reversed. Carnes asks that the Court remand the case with a direction to award him benefits. Remand for an award of benefits is appropriate only when "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). In this case, the ALJ has not yet properly considered Dr. Burry's opinions and, therefore, it is not clear that the cumulative effect of the evidence establishes disability without any doubt. Accordingly, remand for further proceedings is required. On remand, it would be appropriate for the SSA and counsel for Carnes to fully develop the record with treatment notes from Dr. Krotenberg and other professionals that are missing from the record.

NOT FOR PUBLICATION

## RECOMMENDATION.

For the reasons stated above, it is **RESPECTFULLY RECOMMENDED** that the final decision of the Commissioner be **REVERSED** pursuant to sentence four of § 405(g) and the case **REMANDED** for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its Order on the Report and Recommendation and, thereafter, to close the file.

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** this 11th day of July 2016.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE